In the Matter of NEW YORK WORLD-TELEGRAM CORPORATION, Appellant, against JOSEPH D. McGOLDRICK, as Comptroller of the City of New York, et al., Respondents.

Argued January 8, 1948; decided May 21, 1948.

*William H. Bemis* and *George B. Brooks* for appellant.  I. The installment payments made by petitioner and credited to its purchase option for the period from December 10, 1934, to July 1, 1940, are not subject to tax.  An agreement which imposes an unconditional obligation to pay for tangible personal property with the right or option in the obligor to become the owner of such property upon full compliance with the terms of the contract is a conditional sale agreement.  (Uniform Laws Annotated, Vol. 2A, p. 23; Williston on Sales [2d ed.], Vol. I, § 336; *Central Union Gas Co.* v. *Browning,* 210 N. Y. 10.)  II. The payments made on account of interest, dividends, taxes and other like charges are not subject to tax.  III. Where a lease imposes an unconditional obligation to pay for the tangible personal property involved, with the right or option in the lessee to become the owner upon full compliance with the terms of the agreement, the transaction is in essence a sale; and respondents' contention that in this case the parties did not intend a sale is merely to argue that the parties did not intend to make the contract actually entered into.  (*Gardner* v. *Town of Cameron,* 155 App. Div. 750; *Bramhall, Deane Co.* v. *McDonald,*

172 App. Div. 780; *Arter* v. *Jacobs*, 226 App. Div. 343; *Kimball* v. *Cooper*, 134 Neb. 536; *Bradley* v. *Arnold*, 16 Vt. 382; *Vette* v. *J. S. Merrell Drug Co.*, 137 Mo. App. 229; *Coors* v. *Reagan*, 44 Colo. 126.)

*Charles E. Murphy, Corporation Counsel* (*Seymour B. Quel, Isaac C. Donner* and *Harry Katz* of counsel), for respondents. I. The agreement of October 1, 1931, between petitioner and the equipment corporation was a lease by virtue of which petitioner had a " license to use " the tangible personal property covered by the agreement during the period embraced by the tax assessed. This license to use was a " sale " within the express terms of the city sales tax laws in effect during the period involved and petitioner is liable for sales tax on the consideration, i.e., the rental, paid for that license to use. The agreement was not a contract for the conditional sale to petitioner of the property covered. (*Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104; *Cutler Mail Chute Co.* v. *Crawford*, 167 App. Div. 246; *Lambert Hoisting Engine Co.* v. *Carmody*, 79 Conn. 419.) II. The purpose sought to be achieved by the parties proves the contract was intended to be and is a lease. (Bogert on Conditional Sales, in U. L. A., Vol. 2A, p. 22; *Gardner* v. *Town of Cameron*, 155 App. Div. 750, 215 N. Y. 682; *Stern* v. *Drew*, 285 F. 925.) III. The provisions of the option clause show there was no intention to make a conditional sale and prove the contract to be a lease. (*Cutler Mail Chute Co.* v. *Crawford*, 167 App. Div. 246.) IV. The contract does not fall within the definition of conditional sale in the Uniform Conditional Sales Law (Personal Property Law, § 61). V. Other provisions of the lease agreement indicate that it was intended to be a lease, not a conditional sale. VI. The practical construction placed upon the contract by the parties proves it to be a lease. (*Nicoll* v. *Sands*, 131 N. Y. 19; *Woolsey* v. *Funke*, 121 N. Y. 87; *Zimmermann* v. *Roessler & Hasslacher Chemical Co.*, 246 App. Div. 306; *Insurance Co.* v. *Dutcher*, 95 U. S. 269.) VII. The tax was properly assessed upon the portion of the total rent payments determined by the comptroller to be attributable to the license to use the tangible personal property covered by the lease. (*United States* v. *Joliet & Chicago R. R. Co.*, 315 U. S.

44; *United States* v. *Morris & Essex Ry. Co.,* 135 F. 2d 711; *Gold & Stock Tel. Co.* v. *Commissioner of Internal Revenue,* 33 F. 2d 465; *West End Street Ry. Co.* v. *Malley,* 246 F. 625.)

THACHER, J. In January, 1931, the Scripps-Howard organization became interested in acquiring the *New York World* and the *New York Telegram* and this was accomplished by acquiring through various corporations the names, good will and intangible assets of the morning and evening *World* and all the assets, tangible and intangible, of the *New York Telegram.* As the result of various changes of corporate names and intercorporate transactions the properties were vested in two companies: World-Telegram Building and Equipment Corporation (which will be referred to as the Equipment Company) and New York World-Telegram Corporation (which will be referred to as the Publishing Company).

The Equipment Company had acquired possession of the premises at the northeasterly corner of West and Barclay Streets under lease from Rhinelander Real Estate Company and was obligated to pay the rentals reserved in the lease. It had acquired all of the equipment used in the business of publishing the *New York World-Telegram* from the Publishing Company, for which it had given its 6% notes to the Publishing Company to cover the cost of the equipment. The Equipment Company had also borrowed from the Publishing Company sums required for rent under the Rhinelander lease and additional sums to meet the building costs of a new ten-story building, which were also evidenced by its 6% notes.

The purpose of thus vesting all of the physical property in the Equipment Company, which was not engaged in the conduct of the newspapers, was to make available as security for an issue of preferred stock assets costing some three and a half million dollars plus the obligations of the Publishing Company as lessee of the building and equipment. Accordingly, the Equipment Company entered into a lease of the real estate and all of the equipment to the Publishing Company, which owned all of its stock. This lease was executed as of October 1, 1931.

There was no sales tax in the city of New York when these transactions occurred. Pursuant to the enabling act (L. 1934, ch. 873), both branches of the municipal assembly of the City

of New York enacted the first New York City sales tax, which became law on December 5, 1934, when it was approved by the mayor. Eight years later, and more than eleven years after the lease was executed, the comptroller, on June 30, 1943, assessed a sales tax of 2% against the Publishing Company upon payments made under the lease during the period from December 10, 1934, to June 30, 1940, which he allocated to the personal property. The original assessment with penalty interest amounted to $43,788.15, which was increased to $49,570.27 by an additional assessment for penalty interest on May 1, 1945.

Before considering the lease it is important to bear in mind that the validity of this assessment does not turn upon whether the lease may be regarded as a sale for both parties contend that the tangible personal property was sold. The taxpayer contends that the personal property which was delivered in 1931, was sold before the sales tax was enacted, and that it was not the purpose of the law, which became effective in December, 1934, to tax prior sales of property delivered before the act took effect, even though payments therefor may have been made thereafter.

The law itself and the comptroller's regulations disclose the legislative purpose to exclude such sales. The law (§ 2) imposed a tax of 2% upon the amount of the receipts from every taxable sale in the city of New York for the period beginning December 10, 1934, to and including December 31, 1935, and it was provided (Local Laws, 1934, No. 24 of City of New York [published as No. 25], p. 167): " The tax imposed by this local law shall be paid upon all sales made and services rendered on and after December tenth, nineteen hundred and thirty-four, although made or rendered under a contract dated prior to December tenth, nineteen hundred and thirty-four. * * * The comptroller may provide by regulation that the tax upon receipts from sales on the installment plan may be paid on the amount of each installment and upon the date when such installment is due."

The word " sale " or " selling " was defined in subdivision (e) of section 1, as follows (Local Laws, 1934, p. 165): " (e) The word ' sale ' or ' selling ' means any transfer of title or possession or both, exchange or barter, license to use or

consume, conditional or otherwise, in any manner or by any means whatsoever for a consideration, or any agreement therefor, and may include the rendering of any service specified in section two of this local law ".

Subdivision (a) of section 11 of Local Law No. 20, as amended (published as No. 21), authorized and empowered the comptroller to make, adopt and amend rules and regulations appropriate to the carrying out of this local law and the purposes thereof, and on February 11, 1935, the comptroller promulgated the official regulations provided for in subdivision (a) of section 11 (N. Y. City Sales Tax Rules and Regulations — 1935). Among other problems, the comptroller's regulations dealt with the taxability of receipts from sales made before December 10, 1934, and in this connection provided:

" Article 29.— The tax is imposed upon the receipts of every sale of tangible personal property (except such property as is specifically exempted therefrom) at retail in the city of New York on and after December 10, 1934.   *   *   *

" Where tangible personal property was sold and delivered to the purchaser thereof prior to December 10, 1934, no tax is imposed upon the amount of the receipts therefrom even though all or any part of the purchase price was paid after December 10, 1934.

" Where a contract for the sale of tangible personal property was made prior to December 10, 1934, and such property was sold to the purchaser on and after December 10, 1934, the purchaser is required to pay the tax to his vendor on the total selling price thereof. If at the time the contract was made, the purchaser made a down payment, he is required to pay the tax on the unpaid balance due on and after December 10, 1934.

" Where tangible personal property was sold on the installment plan and delivered to the purchaser before December 10, 1934, the tax does not apply to the receipts therefrom even though payment therefor is made on and after December 10, 1934."

The incidence of the tax is sale *after* December 10, 1934. The statute and the regulations leave no doubt that sales made before its effective date are not to be taxed. By express statutory definition conditional sales are sales within the meaning of the statute. Therefore, a conditional sale of tangible per-

sonal property is not taxable if the goods were delivered to the conditional vendee before the tax became effective. All of the tangible personal property was delivered to the appellant under the agreement on or about October 1, 1931. If that delivery was upon a contract of conditional sale or upon an unconditional obligation to pay for it in installments, the comptroller's assessments are without validity.

The agreement is cast in the form, style and language of a lease, but we must look to the rights it confers and the obligations it imposes to determine whether it has the essential attributes of a contract of conditional sale or of an installment sale (*Central Union Gas Co.* v. *Browning,* 210 N. Y. 10). If the conditional vendee has possession of the chattel, is obligated to pay for it and, having paid, becomes or has an option to become the owner of it, the vendor retaining the right to retake the goods if the conditional vendee defaults in his obligation to pay for them, there is a conditional sale (*Central Union Gas Co.* v. *Browning, supra; Gardner* v. *Town of Cameron,* 155 App. Div. 750, affd. 215 N. Y. 682; *Ohl & Co.* v. *Standard Steel Sections, Inc.,* 179 App. Div. 637; *Equitable General Providing Co.* v. *Eisentrager,* 34 Misc. 179).

Section 61 of the Personal Property Law, which is taken from section 1 of the Uniform Conditional Sales Act, is a statement declaratory of the law generally prevalent throughout the United States. See 2 Uniform Laws Annotated, section 1, Commissioner's Note, citing many cases in which leases have been construed to be conditional sales contracts where the buyer upon payment of rentals became or had the option to become the owner of the goods. Additional authorities are collected in Uniform Laws Annotated (Vol. 2A, § 13, p. 21). Section 61 of the Personal Property Law reads as follows:

" § 61. *Definitions.* In this article ' conditional sale ' means (1) any contract for the sale of goods under which possession is delivered to the buyer and the property in the goods is to vest in the buyer at a subsequent time upon the payment of part or all of the price, or upon the performance of any other condition or the happening of any contingency; or (2) any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the

bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract.''

All of the essential attributes of a conditional sale will be found in the provisions of the agreement and lease under the terms of which the Publishing Company regained possession of the equipment which it had transferred to the Equipment Company in exchange for its notes; the use of the land which the Equipment Company had acquired under the Rhinelander lease upon which the Publishing Company paid the rent, and and also the use of the building on this land the cost of which it had advanced to the Equipment Company. The Publishing Company owning all of the stock of the Equipment Company, its apparent purpose was to take advantage of a separate corporate structure to insulate valuable assets against the risks of the publishing business, but both the building and the equipment had been acquired for use in that business, and so the lease was made giving the Publishing Company possession and control of these properties but requiring the Publishing Company to make payments, called installments of rent, which would cover all costs and expense which it would have been required to pay if there had been no Equipment Company. It was even required to pay as "rental " the interest on the Equipment Company's notes which the Equipment Company was obligated to pay to it — no doubt to give these notes security which might make them attractive investments. Under these circumstances it is not surprising to find that the lease carefully provided that the Publishing Company upon performance of its obligations under the lease should become, or have the option to become, the owner of all of the leased property. It is quite obvious from the relation of the parties, the character of the transaction, the properties involved and the frame and structure of the documents used that the instrument was much more than a lease upon the termination of which the real and personal property would revert to the lessor, and that it had all the attributes of a conditional sale under which the lessee upon performance of its obligations would become the owner of all the leased property.

The agreement is called an agreement and lease. In terms it is a lease to the lessee and a hiring from the lessor of real

estate in New York City, together with the buildings and improvements thereon, and of:

" (c) Personal Property: The following-described goods and chattels, to wit:

" Presses, type, typesetting and stereotyping machinery, desks, filing cabinets, and all other machinery, equipment, furniture and fixtures belonging to the Lessor and located or contained in the building situated on the above-described tract of land and in premises occupied by the Lessee at 305 East 45th Street, 460 West 34th Street and elsewhere in the City of New York or State of New York, together with all other machinery and equipment hereafter acquired by the Lessor; it being the intent and purpose of this instrument to sublease to the Lessee all rights of the Lessor herein and in and to said real estate, and all buildings, improvements and appurtenances upon the said premises covered by said Rhinelander lease, and to lease all tangible personal property of the Lessor wherever located."

The term of the lease is for twenty years, with three further terms of twenty-one years each at the lessee's option. The lease required the lessee to pay rent beginning October 1, 1931:

(a) the equivalent of the rentals payable by the Equipment Company under the Rhinelander lease;

(b) one-half per cent per month on the par value of all shares of preferred stock of the Equipment Company issued and outstanding, being the amount required to pay dividends upon this stock;

(c) an additional amount, payable quarterly through a sinking fund or otherwise, sufficient to redeem the Equipment Company's preferred stock in accordance with its certificate of incorporation;

(d) all taxes upon the assets, earnings and business of the Equipment Company;

(e) all other obligations assumed and undertaken by the Equipment Company under the Rhinelander lease; other expenses of the Equipment Company, " including a reasonable charge for or on account of depreciation on said building, machinery, equipment and all Leased Property above specified."

It should be noted that all these obligations are definite except " a reasonable charge for or on account of depreciation on said building, machinery, equipment and all Leased Property above

specified." However, the parties, in the performance of their agreement, adopted straight line rates of depreciation which they regarded as reasonable — 2% annually on the cost of the building and 10% annually on the cost of the personal property. Thus the tenant became obligated to pay for the entire cost of the personal property within ten years and well within the first term of the lease.

It was further provided that the agreement and lease should " continue in full force and effect during the term of any renewal or renewals of said Rhinelander lease (whether or not made at the request of the Lessee herein) so long as (a) any Preferred stock of the Lessor shall remain outstanding and/or (b) any of the notes of the Lessor outstanding on October 1, 1931, shall remain unpaid; unless and until the Lessee herein shall sooner exercise its option as provided in Paragraph (11) hereof and shall have paid the price therein specified."

Thus, except by mutual consent, the agreement and lease contemplated by the parties was to continue until all of the lessor's preferred stock had been redeemed and all of its notes, representing the cost of the building, had been paid, unless the tenant (the lessee) exercised its option under paragraph (11) of the lease to purchase all the right, title and interest of the lessor in the Rhinelander lease and the described premises with the buildings thereon, together with all machinery, equipment and other property covered by the lease and owned by the lessor at any time after October 1, 1937. The price to be paid in the exercise of this option was the cost of the machinery and equipment, *less depreciation paid,* and the cost of the buildings and improvements thereon, *less depreciation paid thereon,* and in this connection the lessor agreed that all moneys paid to it under this option should be used to redeem its outstanding preferred stock and to pay its said notes before said moneys were used for any other purpose, and further agreed to apply the proceeds from all sales of its preferred stock, first, to pay outstanding notes of the lessor representing the costs of building, machinery and equipment, and thereafter as its board of directors might deem best.

The option clause in paragraph (11) of the agreement and lease reads as follows: " (11) The Lessor agrees that, all the

covenants and conditions of this lease being fully performed by the Lessee, the Lessee shall have an option to purchase all the right, title and interest of the Lessor in said Rhinelander Lease and the above-described premises with all the buildings thereon and appurtenances thereunto belonging, together with all machinery and equipment and other property covered by this lease and owned by the Lessor, at any time after October 1, 1937, on giving the Lessor ninety (90) days' written notice of the election of the Lessee to exercise said option. The price to be paid shall be the sum of (a) the cost of said machinery and equipment less amounts paid by Lessee to Lessor on account of depreciation of said machinery and equipment up to the date of expiration of said ninety (90) days' notice, plus (b) the cost of said buildings, appurtenances and improvements less amounts paid by Lessee to Lessor on account of depreciation of said buildings, appurtenances and improvements up to the date of expiration of said ninety (90) days' notice. The Lessor hereby agrees that all monies paid to Lessor under this Paragraph shall be used by Lessor to redeem its outstanding Preferred stock and to pay its said notes before any of said monies are used for any other purpose. Lessor also agrees to apply the proceeds from all sales of its Preferred stock first to pay outstanding notes of the Lessor representing cost plus carrying charges for erection and purchase of the building, machinery, and equipment referred to above, and thereafter for such other corporate purposes as its Board of Directors may deem best. Upon the Lessee paying the said sums in cash to the Lessor on or before the date of expiration of said ninety (90) days' written notice, the Lessee shall be entitled to receive from the Lessor such instrument or instruments, duly executed and delivered, as will convey all right, title and interest of the Lessor (herein) in and to said Rhinelander lease and said land, buildings, appurtenances, improvements, machinery and equipment, to the Lessee, free and clear of all incumbrances whatsoever. In event the Lessee does not so pay for said land, building, appurtenances, improvements, machinery and equipment in cash on or before five (5) days after the date specified in said notice then the Lessee's right to purchase said land, buildings, appurtenances, improvements, machinery and equipment as herein stated shall be forfeited.''

The phrase " at any time after October 1, 1937," refers to the date on which under its charter the Equipment Company was given the right to call its preferred stock for redemption. The option price was to be the cost of the machinery, equipment, buildings, appurtenances and improvements, less the depreciation paid thereon under the provisions of the lease. All these costs, including depreciation at the reasonable rates fixed by the parties, were required to be paid as part of the rent. If such payments were not made when due, the Equipment Company was to be entitled to terminate the lease and retake the leased property, but if the Publishing Company did not default in its payments it was to have the option of becoming the owner of all the leased property, and this was bound to happen before the termination of the lease. Before that could happen, the entire option price (namely, the cost of leased property less depreciation paid) would have necessarily been paid, and the lessee, within the definition of a conditional sale, would have had the option to become the owner without further payments. This event was anticipated by voluntary action upon the part of the Publishing Company in 1941, when it contributed to the Equipment Company $1,100,000 which then retired its outstanding preferred stock, transferred all of its property to the Publishing Company and was dissolved. The fact that the two corporations thus liquidated the situation in anticipation of the liquidation which was required by the agreement and lease does not in the slightest degree change or impair the character of the transaction, which was not merely a lease but a conditional sale, nontaxable because it occurred prior to the enactment of the taxing statute.

The order of the Appellate Division should be reversed, with costs in this court and in the Appellate Division, and the determination of the comptroller annulled.

FULD, J. (dissenting). In disregard of settled restrictions on judicial review of a determination by an administrative agency, the majority of the court is upsetting an administrative decision which, depending upon a finding of fact, has reasonable support in the record. (See, e.g., *Matter of Miller* v. *Kling*, 291 N. Y. 65; cf. *Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104, 108.)

The question before the Comptroller of the City of New York was whether the agreement of October 1, 1931 — called a lease by the parties — effected a conditional sale of the personal property to which it related. If it did, certain payments provided for in the agreement were exempt from the city tax, even though made after the effective date of the tax law — December 10, 1934. On the other hand, the payments were taxable if the comptroller was justified in finding that the agreement was a lease, as it purported to be, rather than a conditional sale.

Whether the agreement was one or the other was essentially a question as to the underlying intent of the parties. (See *Cutler Mail Chute Co.* v. *Crawford,* 167 App. Div. 246, 253; cf. *Gardner* v. *Town of Cameron,* 155 App. Div. 750, 753–757, affd. 215 N. Y. 682.) As the majority itself has observed, that question must be viewed in the light of the nature of the transaction, the situation and relationship of the parties and the purposes sought to be achieved by them. From examination of these circumstances, their intent emerges, for the most part, as a matter of fact and not as a question of law. Principally for that reason, I conceive that, on this record, it is a usurpation of the function of the administrative official to whom determination of the question was committed, for the court to declare, as a matter of law, that the intent of the parties was to accomplish a conditional sale of the personalty.

Indeed, the majority opinion itself goes far to refute the conclusion that a conditional sale was intended. It notes that the apparent purpose of the parties was " to take advantage of a separate corporate structure to insulate valuable assets against the risks of the publishing business " (p. 19). That purpose would have been defeated if the Publishing Company's present position that the contract was one of conditional sale be accepted, for it does not appear that the contract was filed, as required by the conditional sales law, and such failure to file would have subjected the property to the claims of creditors of the Publishing Company (Personal Property Law, § 65). In other words, to credit the contention that the parties, in 1931, intended their agreement as a conditional sale, the comptroller would have been required to conclude that they intended to frustrate their principal objective of removing the

property from the reach of creditors of the Publishing Company. I believe he was fully justified in rejecting that inference and in finding that the transaction was intended as just the type of transfer the parties styled it, a lease.

It is, indeed, highly doubtful whether the 1931 agreement can be held to have accomplished a conditional sale, even if we view the matter as involving a pure question of law. This was a complex transaction, far removed from the simple situation envisaged by section 61 (2) of the Personal Property Law — a " contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract."

Thus, the lease in this case embraced both realty and personalty, and the clause giving the Publishing Company the option to purchase was, by its terms, exercisable only by payment of the agreed price of both the realty and the personalty. A lease of personalty containing an option to purchase is not treated as a conditional sale if the price largely exceeds the aggregate rentals payable thereunder. (See *Cutler Mail Chute Co.* v. *Crawford, supra*; see, also, 1 Williston on Sales [2d ed.], § 336, p. 783.) In the present case, the lessee was not entitled to acquire title to the personal property except by paying a substantial additional amount for the real property as well; and the situation was not within the ambit of section 61 (2) of the Personal Property Law — i.e., where payment of the specified annual rentals for the use of *the personalty* would per se result in payment of the agreed purchase price.

Moreover, apart from that consideration, the rental payments which, according to the majority, were bound to accomplish full payment of the purchase price, were not definitely fixed in the agreement. The court's opinion thus proceeds on the assumption that the lessee was obligated to pay the entire agreed cost of the personalty in the form of rental payments within the term of the lease, by reason of the annual payments of depreciation at the rate of 10% of the cost of the personalty and at the rate of 2% of the cost of the realty. The agreement did

not, however, specify the rate of depreciation, but provided only for a " reasonable " rate; and the record does not conclusively establish that the Publishing Company bound itself, by explicit contract, not to reduce the rate of the depreciation payments actually made by it. Depreciation rates substantially lower than those in fact paid may well have been found by the comptroller to have been the extent of the Publishing Company's obligations in that regard under the lease, thereby necessitating a period longer than the original and renewal terms of the lease to achieve full payment of the purchase price by means of depreciation payments.

Beyond all this, section 61 (2) of the Personal Property Law appears to be aimed primarily at the evil of attempted evasion of the filing requirements of the conditional sales law to the prejudice of creditors or bona fide purchasers who rely on the apparent title of the party put in possession of the goods, by the device of cloaking in the guise of a bailment or lease a transaction which is in substance a conditional sale. (See Bogert, Commentaries on Conditional Sales, 2A, Uniform Laws Annotated, pp. 22, 23.) But, in the present case, no evidence appears of any aim to disguise the real nature of the transaction, and there is no challenge by any creditor or bona fide purchaser. Nor was the retention of title by the lessor here intended to serve the purpose only of securing payment of the purchase price.

Consideration of all the circumstances of the case, it seems to me, clearly points the conclusion that the determination reached by the comptroller is not without reasonable support. That being so, the courts may not interfere.

I would affirm the order of the Appellate Division.

LOUGHRAN, Ch. J., LEWIS, CONWAY and DYE, JJ., concur with THACHER, J.; FULD, J., dissents in opinion in which DESMOND, J., concurs.

Order reversed, etc.