## LEMON v. UNITED STATES.

## WOODRUM v. UNITED STATES.
### Nos. 504, 505.

United States District Court,
W. D. Virginia, Roanoke. Division.
March 23, 1953.

Clifton A. Woodrum, Jr., Roanoke, Va., for plaintiffs.

Howard C. Gilmer, Jr., U. S. Atty., Roanoke, Va., A. Barr Comstock, Sp. Asst. to Atty. Gen., for defendant.

PAUL, Chief Judge..

We are here concerned with two actions each seeking a refund of taxes claimed to have been illegally collected. The cases involve the same facts and questions of law, the tax assessments complained of grew out of the same transaction, and the cases have been heard together. The facts are not in serious dispute and the cases turn upon the interpretation to be placed upon a contract which will be hereafter discussed.

In January, 1945, the plaintiff Lemon was the owner and operator of a shop for the overhauling and repair of airplanes, at Roanoke, Virginia; and the plaintiff Woodrum conducted a flying school at the same field where Lemon's shop was located. On January 13, 1945, the plaintiffs jointly purchased from the War Assets Administration a used airplane described as a Spartan Executive plane. They paid $12,000 for this machine and after it had been brought to Mr. Lemon's shop at Roanoke it was reconditioned at an approximate cost of $1,500. The plaintiffs testify that they bought this plane with no intention or desire to resell it, but acquired it for use in connection with their businesses and for charter.

Some time in March, 1945, a Mr. Pettigrew, who seems to have been piloting a plane owned by the Evans Products Company, of Detroit, stopped at the airport where the plaintiffs' businesses were located and happened to see the Spartan plane. He indicated to Mr. Lemon that the Evans Products Company might be interested in acquiring such a plane. Some days later Mr. Pettigrew, accompanied by Mr. Edward S. Evans, Jr., an official of the Evans Company, returned to Roanoke and Mr. Evans discussed with Mr. Lemon the possibility of buying the Spartan plane. Nothing definite was accomplished at this time. There is some question as to just how further negotiations were conducted. Mr. Lemon testifies that Mr. Evans made a further visit a week or so after his first one and that it was on this second visit that he and Miss Woodrum, having talked the matter over meanwhile, decided to let the Evans Company have the plane. Mr. Evans says that he paid only the one visit to Roanoke; that the further negotiations were conducted by Mr. Pettigrew, although he (Mr. Evans) may have talked to the plaintiffs by telephone.

Whether Mr. Evans was in Roanoke on one or two occasions is of little materiality, but there is one conflict in the testimony which bears materially on the position taken by the plaintiffs in this case. According to Mr. Evans he, in his talk with the plaintiffs, originally proposed to purchase the plane and there was a discussion as to a purchase for the sum of $28,000 cash. He further says that during the discussion "we switched from an actual outright purchase, telling them we would like to lease the plane." The plaintiffs on the other hand testify that there was no proposal made to rent the plane and no discussion of any lease, and that Evans' only offer was to purchase the plane, with two alternatives as to price and method of payment; either to pay $25,000 cash, or $14,000 cash and $14,000 in six months, making a total of $28,000. Plaintiffs state that they chose the latter proposition; that they considered that they had made a sale.

Under date of March 22, 1945, the parties entered into a written contract in the following terms:

"Lease and Option

"In consideration of the sum of $1.00 cash in hand paid by the Evans Products Company to W. Clayton Lemon and Martha Anne Woodrum, said W. Clayton Lemon and Martha Anne Woodrum hereby agree as follows:

"1. W. Clayton Lemon and Martha Anne Woodrum hereby lease and rent to said Evans Products Company for a term of six months from date hereof, one airplane, Spartan Executive, Model 7W, serial No. 31, NC 46426 with Pratt & Whitney 450 Wasp Junior engine and said Evans Products Company agree to pay for rental of said airplane the sum of $14,000 in advance, receipt of which is acknowledged by W. Clayton Lemon and Martha Anne Woodrum.

"2. W. Clayton Lemon and Martha Anne Woodrum further give and grant to Evans Products Company an option for a term of six months after date hereof for purchase of said airplane, for the sum of $14,000. If the Evans Products Company elects to exercise this option, it shall do so by notice in writing and payment to W. Clayton Lemon and Martha Anne Woodrum of said sum of $14,000 in cash.

"3. If the option to purchase is not exercised, the airplane shall be redelivered to W. Clayton Lemon and Martha Anne Woodrum at Roanoke, Virginia at the expiration of said six months period in its present condition, ordinary wear and tear excepted.

"4. Evans Products Company will protect the plane with full coverage of insurance."

The plaintiffs testify that this contract was produced by Mr. Evans while he was in Roanoke and was there signed by the parties. Mr. Evans is of opinion that the contract was prepared by the attorney

for the Evans Company in either Detroit or New York, and that after being signed on behalf of the company it was sent to Roanoke for signature by the plaintiffs. In either event there seems no question that the contract was drafted by Mr. Evans or by some representative of his company and that the plaintiffs, when it was presented to them, signed it without raising any question or seeking any legal advice as to its effect.

The initial payment under the contract was paid by a check for $14,000, dated March 22, 1945, and the plane was turned over to Evans Products Company. Under date of September 11, 1945, the Evans Company mailed to the plaintiffs a check for $14,000 together with a letter stating that this was for the purpose of exercising "our option with you dated March 22, 1945 to purchase Spartan Executive * * *." The letter further requested that the certificate of ownership showing transfer of title and any other papers pertaining to the plane be sent to Evans.

The Evans Company after using the plane something over a year communicated with Mr. Lemon informing him that they had bought a new and larger plane and stating that they desired to sell the Spartan. As a result Mr. Lemon repurchased the Spartan for the sum of $20,000 cash in May, 1946, and three or four months later it was sold by him to a purchaser in Texas for $22,500. It is testified by Mr. Lemon that this last purchaser owned the plane as late as October, 1951, and at that time was quoting a price of $20,000 on it.

These taxpayers filed separate tax returns for the year 1945. Neither of them had any legal or accounting training and in preparing their returns neither of them sought the advice or assistance of any attorney, accountant, or other person with expert knowledge of the tax laws. In filing their returns each of these taxpayers treated the sum of $14,000 which each had received from the disposition of the Spartan plane as ordinary income received in the course of business. It was included as part of the sum designated as "total receipts" from business set out in Schedule C. So treated it was, of course, taxable as ordinary income and taxes were calculated and paid on this basis. In these returns no part of the $14,000 was entered as income from rent or from sale of capital assets.

Some time in the year 1947 Mr. Lemon, whose annual business ran to a considerable sum, employed the accounting firm of T. Coleman Andrews & Company to make an audit of his books and records from the year 1942 to and including 1946. As a result of this examination the accountants made a report in which it was concluded that as to the year 1945 the taxpayer had erred in his tax return in respect to the manner in which the Spartan plane transaction had been treated. Miss Woodrum's return for 1945 was also examined by these accountants, apparently because of her interest in the plane. The accountants reported it as their opinion that both of these taxpayers were in error in reporting the proceeds from the disposition of the plane as ordinary income and concluded that the transaction should have been treated as a long-term capital gain. It may be said that certain other errors were found in the 1945 returns of both of these taxpayers, some to the advantage and some to the disadvantage of the taxpayers; but they are not involved here.

Based on the result of the audit both of the taxpayers filed amended returns for the year 1945 in which, among other adjustments, they set out the proceeds from the disposition of the Spartan plane as arising from the sale of a capital asset, taxable as a long-term capital gain. Based on this treatment of the airplane transaction, which decreased the tax liability, the taxpayers sought a refund on the taxes paid. Their claims in this respect were rejected by the Bureau of Internal Revenue and they were assessed with some deficiencies arising out of other errors in the original returns, which deficiencies they paid. The present controversy relates only to such part of the taxes assessed as arose from the airplane transaction and the only ques-

tion before the court is to determine the true nature of this transaction.

More definitely stated the sole question presented is (1) whether the transaction constituted a lease and subsequent sale in which case the first $14,000 was one hundred per cent taxable to the taxpayers as ordinary income, and the gain on receipt of the second $14,000 represented long-term capital gain only fifty per cent of which was taxable, as the Government claims, or (2) whether the transaction constituted an installment sale for $28,000 consummated on payment of the second $14,000, in which case the total gain represented long-term capital gain and no part of the $28,000 represented ordinary income, as the taxpayers claim on the theory that in spite of the written contract the parties truly intended a sale and not a lease.

It has been stipulated that if the plaintiffs are entitled to a refund, Mr. Lemon would be entitled to recover the sum of $2,628.92 and Miss Woodrum to recover $1,626.70; with interest in each case according to law.

■ The contract which gives rise to the controversy here is designated a "Lease and Option" and its language bears out its title. But it is well settled that the designation given the transaction is not conclusive of its true nature. In 47 Am.Jur. 25 it is said:

"In accord with the general rule that the mere form of an agreement or the name given it by the parties does not control its classification, the fact that the contract is called a 'lease' * * * does not necessarily render the contract one of bailment rather than a conditional sale."

And in 78 C.J.S., Sales, § 555, page 260 we find it said:

"The question of intent is one of fact to be determined from the circumstances surrounding each case; and the situation of the parties, their purpose, the thing they sought to accomplish and the method they employed, are all important. * * * Once the intention of the parties be-comes clear, the form of the instrument is of little consequence and it is immaterial what the instrument is called or how skillfully the real intention of the parties is disguised: * * * Mere forms, it has been said, will not be allowed to overshadow the substance; and the mere use of technical words will not prevent a court from determining the true nature of the transaction."

For cases confirming this principle see Hervey v. Rhode Island Locomotive Works, 93 U.S. 664, 673, 23 L.Ed. 1003; Heryford v. Davis, 102 U.S. 235, 244, 26 L.Ed. 160; Murch v. Wright, 46 Ill. 487, 95 Am.Dec. 455; Fidelity Ins. etc., Co., v. Shenandoah Valley R. R. Co., 86 Va. 1, 10, 9 S.E. 759; New York World-Telegram Corp. v. McGoldrick, 298 N.Y. 11, 80 N.E.2d 61; Baldwin v. Van Wagener, 33 W.Va. 293, 10 S.E. 716, 717; Air Equipment Corp v. Rubbercraft Corp., 2 Cir., 79 F.2d 521, 522; Corbett v. Riddle, 4 Cir., 209 F. 811.

In spite of the language used in the written contract between the plaintiffs and Evans and the title given the contract, consideration of all the surrounding circumstances leads to the conclusion that this transaction was a sale. Some of these circumstances need to be enumerated.

In the first place it is agreed that in the first meeting between the parties the only talk was of a possible sale. The plaintiffs say that at no time, either then or thereafter, was any discussion had other than on the basis of a sale. Mr. Evans admits that his original proposal was to purchase the plane and that discussion was had as to buying it for $28,-000 and that the later suggestion of leasing the plane for six months came from him. It is to be noted also that the instrument which the parties signed was prepared by attorneys or other representatives of the Evans Company and tendered to the plaintiffs for their signatures. It appears that the plaintiffs, neither of whom have any knowledge of law or legal terminology and who had no legal advice in the matter, signed the con-

tract in the understanding, so they testify, that it represented a sale on terms of $14,000 cash and an equal amount in six months. Their understanding is supported by the fact that in making their tax returns they reported the entire $28,000 as being received from the sale of the plane and reported no part of it as "Income from rents."

On the other hand it is obvious that it was decidedly to the advantage of the Evans Company to have the transaction assume the form of a lease with option to purchase. In that way it was able to treat the initial payment of $14,000 as for rent paid, constituting a deductible business expense when it came to computing the company's net income for tax purposes. And the testimony shows that this is what Evans did.

There are other circumstances to indicate that the real intendment of the parties was a sale. One of these is the amount paid ($14,000) for the so-called lease for a period of six months. It is hard to believe that the Evans Company, or any other business concern, would have been willing to pay for the mere use of the plane for six months a sum equal to one-half of that for which they could purchase it. The suggestion that the life of airplanes is very short and that half of the value of the plane represented a fair rental for six months is not convincing in face of the fact that the same plane, after changing hands several times was, as late as 1951, still in use and held at a valuation of $20,000.

The contract here does not provide that in case the "option to purchase" is exercised the rental payment of $14,000 is to be credited as part of the purchase price. On the contrary the initial payment is described as being solely for the six months rent. If this sum was a fair rental and was paid solely as rent for the plane for six months then we would have a situation where the plaintiffs had agreed, at the expiration of that time, to sell the plane for $14,000. It is not reasonable to believe that plaintiffs would, merely because of six months use, have reduced the price of the plane from $28,000 to $14,000. It is even more unreasonable when it is remembered that the plaintiffs, after Evans had used the plane over a year, were willing to pay $20,000 to reacquire it.

Another fact which indicates, to some extent at least, that this transaction was a sale is that the so-called rent of $14,000 was paid in one lump sum when the plane was delivered to Evans. It is, of course, permissible and not unheard of for a rental charge to be paid in advance for the entire period of the lease. But it is not usual. Most frequently rental payments are made periodically throughout the duration of the lease. The fact that the entire $14,000 denominated rental was embodied in one payment, made when Evans took possession of the plane, adds support to the view that this payment was really intended as the initial payment on the purchase of the plane.

It is noted also that the contract requires the Evans Company to keep the plane insured. Ordinarily it is the lessor who carries the insurance on leased property, not the lessee. A provision of this sort in a lease is somewhat unusual. It is however entirely consistent with a sale where delivery of the property has been made and in order to protect the vendor in payment of deferred installments of the purchase price the vendee is required to keep the property insured until fully paid for.

It may be that no one particular fact of those which have been recited establishes the nature of this transaction. But the sum of them all leads to the conclusion that when this plane was delivered to Evans both parties to the contract intended a sale and considered that one had been made. It is evident too, I think, that the written contract which was prepared by Evans was drafted in the language used for the purpose of a tax advantage to the Evans Company. As an interesting sidelight on this aspect of the transaction it appears that in the course of the controversy between the plaintiffs and the Bureau of Internal Revenue as to the amount of taxes due, counsel for plaintiffs wrote Mr. E. S.

Evans asking the latter whether he (counsel) was correct in understanding that, in spite of the language of the contract, a sale had been intended. Instead of a prompt answer to this simple question no reply was made for about three weeks, during which time Mr. Evans had referred the inquiry to an attorney retained by his company; and it is significant that this attorney was not the company's general counsel but was a tax expert employed solely for his advice on tax matters.

The question of whether a contract which is designated a lease is in fact a sale has been presented in cases almost without number, and in the efforts to ascertain the true intent and purpose of the transaction the courts have considered various facts tending to throw light upon the problem. In the case of a contract which, as here, is ostensibly a lease with option to purchase, it has generally been held that a marked disproportion between the amount designated as rental payment and that named as the purchase price is strongly evidential that a conditional sale was intended. As for example, where the amount named as rent constitutes a large part of the value of the property and where the purchase may be completed on the payment of some disproportionately small amount.

> "Indeed the fact that the lessee can acquire the property at the termination of the lease for only a nominal consideration has been deemed strongly persuasive that the contract is a conditional sale." 47 • Am.Jur. 26. See also 6 C.J. 1088.

In many cases the courts have had little difficulty in determining that contracts nominally of lease with an option to purchase were in fact sales. These have, in most instances, been cases where the so-called rental consumed practically the entire value of the property and where the option to purchase could be exercised on the payment of some further trivial amount. Typical cases are: Motors Mortgage Corp. v. Purchase-Money Note Co., 38 Ga.App. 222, 143 S.E. 459; Giligian v. New England Truck Co., 265 Mass. 51, 163 N.E. 651; Stern v. Drew, 52 App.D.C. 191, 285 F. 925; Loomis v. Bragg, 50 Conn. 228, 47 Am.Rep. 638; Corbett v. Riddle, 4 Cir., 209 F. 811, 813.

However, when the principle is recognized that a disproportion between the amount paid for the "rent" and that necessary to complete the purchase may be considered as evidence of the true purpose of the parties, it is clear that no invariable rule fixing the limits of this disproportion can be adopted. The nature and value of the property involved, the length of time of the so-called rental period, the time when the "option to purchase" may be exercised, are among the many factors to be taken into consideration along with the provisions of the contract dealing with payments to be made.

See 47 Am.Jur. 25, where it is said:

> "It is not always clear whether an obligation to pay money is one with respect to the purchase price or merely one for the use of the property. In a doubtful case, consideration is usually given to the question whether the payments stipulated for are in such amounts spread over such a period of time, and to be made in such manner and upon such conditions that, when compared with the original value of the property, its probable depreciation, and its likely worth in the event of redelivery of possession at the end of the term, they may properly be regarded as compensation for the use of the property bailed, or, on the other hand, as payments on an absolute obligation for the purchase price, which would be consistent only with the concept of a conditional sale."

In Burroughs Adding Mach. Co. v. Bogdon (In re Munger Fish Co.), 8 Cir., 9 F.2d 54, the amount necessary to exercise the option to purchase was approximately eleven per cent of the amount previously paid as rental. This transaction was held to be a sale. In Re Rainey, D. C., 31 F.2d 197, 199, the contract for the "lease" of some machinery for a period of three months called for rental payments amounting to 60 per cent of the value of the property. There was an

option to purchase on the payment of the remaining 40 per cent. This transaction also was held to be a sale.

Comments of the courts in these cases are quite appropriate to the instant case. In Re Rainey the sum of $487 had been paid as rental for three months on machinery valued at $812, with the right in the lessee to purchase for a further payment of $325. The court, in commenting on this arrangement, said:

"There is nothing to indicate that the machinery would deteriorate to such an extent in so short a time, and when we consider that it was purchasable at the end of the three months for $325, namely, the sum deposited as partial security in the first instance, its purchase became virtually compulsory. True, the bankrupt had the option of returning the machinery at the end of the term, and of getting back the deposit; but as a practical matter it is difficult to imagine this being done, or that it was ever in fact contemplated."

And in the Munger case, 9 F.2d at page 56, the court says:

"The final payment, which is nominally the purchase price, is so small in comparison with the entire purchase price as to leave no real choice to the 'lessee.' The obvious purpose was to dispose of the machine under such conditions that when the 'lessee' had paid the 'rental' he could not afford to fail the relatively small final payment to obtain it. This would have been the obvious and natural, if not the inevitable, result. Evidently it was what the parties desired and intended to accomplish."

The application of the above quotations to the instant case is obvious. After the Evans Company had paid as "rental" for the brief period of six months an amount equal to one-half of the $28,000 at which the plane was valued it could not afford to forego the opportunity to acquire title to the plane by paying the remaining one-half of the total value. And it is evident that Evans never contemplated any course other than to pay the second $14,000 and complete the sale.

It is not the financial arrangements alone which indicate the true nature of this transaction, but when they are considered along with the various other facts which have been recited, I see no escape from the conclusion that what the parties agreed on was a sale of the plane on the terms of one-half down and the balance in 6 months—one of the proposals originally made to the plaintiffs —and that they both understood that a sale had been made; and that the contract was couched in the language used in an effort to benefit the Evans Company in the matter of taxes.

The determination that this transaction was a sale leads to the result that plaintiffs were entitled to have their taxes for 1945 adjusted on the basis claimed in their amended returns, and that they are entitled to recover the respective sums which have been stipulated as resulting from such adjustment.