Charles A. Loreto, J.
Canadair, a wholly owned subsidiary of General Dynamics Corporation, is an airplane manufacturer *322 located in Canada. Seaboard has acquired a number of cargo aircraft from Canadair; these are propeller-driven.
In July of 1963 Seaboard entered into an agreement with Douglas, an aircraft manufacturing company, whereby Douglas agreed to manufacture and deliver to Seaboard a DC 8 jet airplane which will cost $8,000,000. Almost completed, it is scheduled for delivery in June, 1964. Under the Douglas agreement, Seaboard is then to execute a 10-year lease agreeing to pay rent of $1,072,071 yearly in rent for the airplane; discounted at 6%%, the present value of these rental payments is approximately $8,000,000, the present value of the aircraft. After January 1, 1971 Seaboard, under the agreement, has an option — which, it is reported, has been withdrawn during the pendency of this suit — to purchase the aircraft by payment of a premium that will be less than the then value of the aircraft.
Two suits for an injunction have been instituted against Seaboard and Douglas — one by Canadair and the other by Irving Trust Company. There are four basic agreements between Canadair and Irving Trust on one side and Seaboard on the other, which are the bases of these suits. Essentially, the agreements constitute chattel mortgage and equipment trust agreements. It is charged that by reason of its agreement with Douglas, Seaboard has violated various restrictive provisions of its agreements with Canadair and Irving Trust. These restrictive provisions are identical in the agreements of both plaintiffs. By these motions temporary injunctive relief is sought against both defendants, restraining the continuance of the alleged violations.
Not only do the defendants oppose the motion for a temporary injunction, they also move to dismiss the plaintiffs’ suits or to stay them, contending that the Civil Aeronautics Board has primary jurisdiction to pass upon the enforcibility of the Canadair agreements.
In considering the problem posed by this litigation, it is necessary to know certain pertinent facts regarding the financial position of Seaboard. The total indebtedness of Seaboard is $32,000,000. Of this total, its indebtedness to Canadair is $29,000,000, which is secured by the agreements of chattel mortgage and equipment trust referred to. It incurred this indebtedness to Canadair in the purchase of flight equipment sold to it by Canadair, as well as by reason of loans made to it by Canadair. Plaintiffs state that Seaboard’s net worth at present is $4,700,000 and that it has a deficit working capital of $2,650,000.
*323 The plaintiffs state that they advanced credit to Seaboard in the light of the known facts concerning its assets and obligations and, assessing the risks involved, obtained the chattel mortgage and trust agreements; that from their point of view as creditors they had a right to expect only such material changes as would arise out of normal business operations of Seaboard; that the negative covenants in their agreements were intended to guard against any developments whereby there would be a worsening of the basic financial position of Seaboard or an increase in risks beyond those arising out of normal business operations; that having sold millions of dollars of aircraft to Seaboard on credit and having made loans to it under the trust agreements which provided customary protective provisions, Seaboard should not be allowed to destroy that measure of protection by acquiring a very large competitive creditor in violation of the restrictive covenants.
Both plaintiffs dread the prospect of what will happen to their $29,000,000 credit claim if Seaboard were to default in its obligation under the Douglas agreement and Douglas were to press for its enforcement. They point to Seaboard’s precarious financial condition in the past several years.
Seaboard attempts to justify its entry into the Douglas agreement, stating that it is a matter of current business necessity. It states that it might lose a substantial military passenger business, referred to as MATS, unless it were to use a jet plane for such service; that out of a total gross income for the year 1963 of $27,500,000 (which left a net income of $1,800,000), $8,500,000 of this gross business was derived from MATS; that its contract with MATS ends in June, 1964; that MATS is now considering renewal contracts for this service; that Seaboard has been informed that MATS prefers jet planes, and that unless Seaboard is prepared to show that it can provide a jet plane, it will probably lose this sizable and very important part of its gross income.
The first question that should be considered is that attacking this court’s jurisdiction. Section 408 of the Federal Aviation Act (U. S. Code, tit. 49, § 1378, subd. [a]) provides:
‘ ‘ Consolidation, merger and acquisition of control.
“ (a) Prohibited acts. It shall be unlawful unless approved by order of the Board as provided in this section * * *
(5) for any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever ”.
*324 Douglas claims that the Canadair agreements fall within section 408 of the Federal Aviation Act, contending that by virtue of those agreements Canadair is given “ control ” of Seaboard that requires approval of the Civil Aeronautics Board (CAB), which would have primary jurisdiction in the matter. Subdivision (b) provides in part that any person seeking-approval of “ acquisition of control specified in subsection (a) of this section shall present an application to the board ’ ’; thereupon the board shall notify persons having a substantial interest in the proceeding of a public hearing, and, after such a hearing, unless the board finds that the “ acquisition of control will not be consistent with the public interest or that the conditions, of this section will not be fulfilled ’ ’, it shall by order approve the “ acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe”. Subdivision (b) also provides that the board shall not approve any acquisition of control which would result in creating a monopoly or jeopardize another air carrier not a party to the acquisition of control.
Douglas’ attorneys assert that the docket files of CAB indicate that the Canadair agreements were filed there in February, 1961. This is disputed by Canadair’s attorney. They assert that what was then presented to CAB was a matter of interlocking directorates, which were adjusted, and the proceeding then became moot; and that there is nothing sub judice concerning the question of “ acquisition of control ”.
It has not been shown that either then or up to the present date any of the interested parties have raised the question of “ acquisition of control ’’ before the CAB. Canadair’s attorneys argue that these agreements merely provide for the ordinary debtor-creditor relationship, with the usual protective terms found in such agreements; and that “ control ” ordinarily means the direction and running of a business and does not embrace the situation where the ordinary creditor status is protected with the usual remedies available to the creditor. On the other hand, Douglas’ attorneys point to some expressions by examiners of CAB indicating that they believe that a creditor-debtor relationship may involve control. However, no clear-cut and authoritative citation for this contention has been presented. No case has been cited covering a situation of control exercised by a financing agreement such as these agreements. While under the facts of this case the CAB may entertain jurisdiction and then would have the right under the authorities to primary jurisdiction, the court is not satisfied it must , so find on the papers submitted. Perhaps that may be the best forum for the *325 parties, if it would accept and retain jurisdiction. Therefore, the motions to dismiss the suits are denied.
With respect to the plaintiffs’ motions for a preliminary injunction, there are really only three of the negative covenants that the court need explore for their claimed violation: (1) that the Douglas agreement constitutes an acquisition of property subject to a conditional sale agreement; (2) that it provides rent in excess of $1,000,000 in at least one fiscal year; and (3) that in one fiscal year Seaboard made a commitment to spend more than $1,500,000 for capital assets.
The first query, then, is whether the Douglas agreement is a conditional sale, whether with or without an option to perfect title. If with an option, merit is found for the view that it might be exercised, for it would redound to the advantage of Seaboard. However, the Douglas attorneys contend that the agreement is not a conditional sale since Seaboard is not obligated to pay for the exercise of the option (citing Matter of New York World-Telegram Corp. v. McGoldrick, 298 N. Y. 11, 18).
Section 61 of the New York Personal Property Law defines a conditional sale to include “ any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract. ’ ’
Seaboard had the option of becoming owner of the airplane upon compliance with the terms of the lease and upon payment of the option price. The payment to be made on the exercise of the option is by no means nominal, the Douglas attorneys say. Further, whether or not the option will be exercised is not a foregone conclusion, for technological changes and business requirements are factors that would necessarily be considered in making a judgment in that regard. On the submitted papers alone the court cannot rule, as a matter of law, that the agreement should be construed as a conditional sale.
The Douglas attorneys now state that the option has been deleted. Even without an option the Canadair attorneys contend that since the aggregate rentals over the period of the lease equal the present purchase price of the plane, the agreement must be construed to be a prohibited conditional sale. They believe that the plane, after the last rental payments, would be left with Seaboard as its owner for all practical purposes. This may come about. But must the court on this motion conclude that to be the actual intendment of the parties, or should not *326 what the actual intendment of the parties is in that regard be resolved upon a trial?
And while the Douglas agreement imposes obligations upon the lessee as to fire, loss, taxes, etc., usually borne by a purchaser, it is shown that such terms are usually found in leases of airplanes.
A capital investment of $1,500,000 is permissible to Seaboard in a fiscal year. It is contended that the Douglas agreement involves a present prohibited commitment in excess of $10,000,-000 for a capital asset. The covenant states that Seaboard will not make “ expenditures or commitments for fixed or capital assets ” in excess of $1,500,000 during any fiscal year. It is not claimed that expenditures in excess of that amount have been made or will be made under the agreement. The dictionary affords no particular help in giving a definition of the word ‘ ‘ commitment ’ ’ as used in this context. The court interprets the word to mean ‘ ‘ to pledge ’ ’; and the court interprets this provision of the agreement to bar the pledge to pay in any fiscal year more than $1,500,000. The court does not construe it to bar the pledge to pay a sum not exceeding $1,500,-000 in each fiscal year, even though the aggregate over a number of years would exceed that sum. As the same provision permits the actual expenditure of sums not exceeding $1,500,000 in a fiscal year, a contrary interpretation for the word “ commitment ” would necessarily reveal an inconsistency that should not be reasonably ascribed to the parties. Therefore, that word is construed to mean in this clause an obligation not to pay out as a result of a pledge more than $1,500,000 in any fiscal year.
The next question is whether the Douglas agreement with the option eliminated and on this motion considered as a lease, requires yearly rentals in excess of $1,000,000. It is possible so to conclude, giving a strict technical and limited construction to the clause prohibiting “ annual rentals in the aggregate in any one year of $1,000,000.” Canadair’s attorneys argue that as the agreement used the term “fiscal year ” in other contexts, the words “in one year” as here used necessarily mean calendar year, and for the calendar year 1964 the payment exceeds $1,000,000. There is no doubt that New York law should apply in construing the Canadair agreements. However, if the agreement executed on July 26,1963 with the first payment made on that date, should require a construction of yearly payments to be yearly from that date, then the total payments for the year ending June, 1964 do not exceed $1,000,000. This may be a construction found by reason of the payments required *327 from the hegiiming that the parties intended to give in this regard, which the court might accept and therefore find the rental payments not to exceed the permissible limitation. That the Douglas agreement was executed in California and may require California law in its interpretation is of no moment on this point. In the court’s opinion there is no clear showing of a violation of this covenant.
The foregoing, as well as the following, considerations prompt the court to deny the application for a temporary injunction. While it is true that Douglas knew or should have known and is chargeable with knowledge of the terms of the Canadair agreements, the plaintiffs could have but did not apply sooner for this relief. It is true that they protested the Douglas agreement as early as August, 1963, and attempted a negotiation of their differences. The fact is that they suffered Seaboard to make payments to Douglas of $309,000 and allowed Douglas to proceed with the construction of the plant to the point where it is almost completed. Moreover, Seaboard has not failed to make payments to Canadair when due; and whereas its profit in the year 1962 was $1,000,000; for the year 1963 it was $1,800,000. With the possible loss of the MATS business, not only would harm be done to Seaboard, but this loss would redound to the harm of both the plaintiffs and Douglas. Too, it must be remembered that no lease has as yet been executed by Seaboard under the Douglas agreement. At this juncture, the court is satisfied that greater harm would be done to all the parties by the allowance of a temporary injunction than by its denial. i , ; •
There is no doubt that deeply embedded in and underlying this controversy is a matter of business judgment, and whatever decision the parties have made in bringing this controversy to issue they have made with knowledge of the risk of a possible adverse ruling. While the court is cognizant of the fact that it is confronted only with the legal aspects of the dispute, it hopes that the principals will continue in their efforts to make an accommodation that will equitably insure their creditor positions and permit Seaboard to prosper.
Upon a trial the court of equity may be able by its persuasion, intercession, or decree, even though it might be required to extend the terms of such a decree beyond the traditional limits, to bring about such result.
The respective motions of the parties are denied.